**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

In re:                           )
                                 )
CORINA DRAGNEA,                  )   Case No. 2010-34418
                    Debtor.      )
_____  )
                                 )
                                 )   Adv. Pro. No. 17-02248-C
DUMITRU DRAGNEA,                 )
                    Plaintiff,   )
v.                               )
                                 )
CORINA DRAGNEA,                  )
                    Defendant.   )
_____  )

**OPINION**

**Before: Christopher M. Klein, Bankruptcy Judge**

_____

David M. Sternberg, Jacob M Barlev, Walnut Creek, CA, for Plaintiff.

Stephen T. Cammack, Sacramento, CA, for Defendant.

_____

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

The key issue in this declaratory judgment action is whether an individual's Chapter 11 plan can extinguish nondischargeable debt. The answer is yes, if the creditor agrees to the plan.

This cross-border marital dissolution, featuring property divisions in California and Romania and an attempted collateral attack on Romanian judgments, illustrates the utility of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, as a procedure to address disputes regarding contractual aspects of Chapter 11 plans that are ill-suited to contempt proceedings.

The debtor contends that her confirmed chapter 11 plan

extinguished her equalizing payment obligation under a marital settlement agreement (MSA) incorporated into a California dissolution judgment. Disagreeing, her former spouse argues that it is impossible as a matter of law for an individual's chapter 11 plan to lead to discharge of an 11 U.S.C. § 523(a)(15) debt.

The reality is that the chapter 11 plan, as permitted by 11 U.S.C. § 1123(b), was the vehicle the parties used bilaterally to compromise the MSA debt under nonbankruptcy law. This settlement operated as an accord and satisfaction that extinguished the original obligation as a matter of state law, thereby leaving zero to eliminate by virtue of the bankruptcy discharge.

<u>Findings of Fact</u>

Dumitru and Corina Dragnea fled Communist Romania, gained political asylum in the United States in 1985, settled in California, and are now United States citizens.

Dumitru, a university graduate and machinist, opened an auto repair business. Corina was employed as a lab technician.

Since 1993, they have also operated board and care homes under the name Corina Care Homes. They still separately own and operate board and care homes in Sacramento County.

They accumulated other California real estate before 2005, including five residences and various interests in land.

In Romania, they acquired at least five parcels of real estate and interests in two Romanian corporations.

Beginning in 2002, Dumitru acted as manager (Administrator) of Metalotex Corporation in Romania, a business in which they had acquired a minority interest.

All of the properties purchased in California and in Romania before 2005 were purchased jointly with community property funds. Both California and Romania are community property regimes.

In March 2005, Corina filed two divorce actions after 34 years of marriage, one in California and one in Romania.

The Romanian divorce became final as to marital status in April 2006, leaving property division to future determination.

The final California divorce judgment incorporated the MSA agreed by the parties and was entered September 13, 2007.[1]

Dumitru and Corina, who were self-represented, used sample MSA forms without tailoring them to reflect their actual situation and without eliminating internal inconsistencies.

Their MSA divided California, but not Romanian, property. Dumitru received: six real estate parcels (including one board and care home); all personal property associated with his auto repair business; and seven vehicles. Corina received: five real estate parcels (including two board and care homes); and two vehicles. They jointly retained five real estate parcels.

The MSA required Dumitru to pay $15,000 of a $30,000 loan from Corina's mother and half of a $100,000 equity line of credit on the residence retained by Corina.[2]  And, to equalize the property division, Corina agreed to pay Dumitru $150,000.  All payments were due within two years, with interest thereafter. The payments achieved the status of judgment debts by virtue of incorporation into the California divorce judgment.

---

[1]Cal. Super. Ct., County of Sacramento, No. 05FL02058.

[2]The MSA is ambiguous about whether Dumitru would pay half of the accrued interest on the equity line of credit.

The MSA included a term sheet signed August 18, 2006, which states "Corina and Dumitru agreed [sic] to equally divide the community property in Romania."

Dumitru obtained recognition in Romania of the 2007 California divorce judgment under Romania's civil law exequatur procedure (recognition of foreign judgments).[3]  Corina then asked a Romanian court to divide Romanian marital property.

The Deva Court of Law, applying Romanian Law to Romanian assets, determined on March 4, 2008, which Romanian assets were community property, valued them, allocated them between Corina and Dumitru, and ordered Dumitru to make an equalizing ("balancing") payment to Corina.

Dumitru appealed.  The Hunedoara Tribunal Civil Court decision rendered December 2, 2009, affirmed the Deva court except that it reduced Dumitru's equalizing payment from about $84,365.89 to $56,870.97.[4]  Further appeals have been unavailing.

Corina collected the Romanian equalizing payment from Dumitru's bank accounts in Romania.

Corina also flexed economic muscle in Romania.  Using her

_____

[3]The Bucharest Tribunal ruled that it "Acknowledges full legal effects on Romania's territory of the court decision pronounced in the USA by the High Court of California, Sacramento Court, on 25th April 2007 in file no. 05FL02058, regarding the divorce, and the court decision of 13th September 2007 regarding the partition, pronounced in the same file by the same court." (Official Translation, Plaintiff's Ex. 8).

[4]Plaintiff's Ex. 9.  This was a reduction by 77,603.50 lei to 156,131.50 lei, plus 10,289 Euros. The Romanian currency unit is the Leu (plural, Lei). Some values are in Euros as Romania is a European Union member state.  On 12/02/2009, mid-market exchange rates were: 1 Leu = $.3543; 1 Euro = $1.5098. www.xe.com/currencytables/?from=USD&date=2009-12-02.

separate property funds to purchase another block of Metalotex shares, she gained control of Metalotex and fired Dumitru.

His trial testimony lamenting how he had made Metalotex profitable reveals bitterness that animates the present dispute.

Dumitru did not pay the sums he owed under the MSA. Corina paid her mother Dumitru's $15,000 share of the $30,000 loan and paid his $55,214 half of the $100,000 equity loan, which cost $110,427.11 to extinguish when refinancing her residence.[5]

Corina, having succeeded to the right to receive $70,214 from Dumitru, did not pay him the $150,000 equalizing payment.

As of June 2010, the net California obligation of Corina to Dumitru was $79,786. Dumitru was still pursuing vindication in Romania. Corina threatened litigation over MSA real property transfers to Dumitru that exposed her to personal liability to undersecured creditors on Dumitru's property.

On June 1, 2010, Corina filed chapter 11 case No. 2010-34418 as a health care business operating two elder care homes. She scheduled assets of $1,251,450 and liabilities $2,094,843. Much of the debt reflects leveraged real estate squeezed by the plummet in values in the Great Recession of 2008.

She scheduled Dumitru as a creditor owed an undisputed net debt of $85,000 based on her MSA obligations.

Dumitru filed proof of claim #3 for $150,000, attaching materially misleading snippets from the MSA that omitted mention of his countervailing obligation to pay Corina $70,214.

Corina operated in Chapter 11 for nearly two years monitored

_____

[5]Corina Dragnea Dep. Ex. 13.

1  by a patient care ombudsman appointed under 11 U.S.C. § 333, who

2  regularly reported "outstanding" operation of the facilities.

3      Corina proposed a Chapter 11 plan on December 15, 2011, to

4  be financed by operating profits and sale of real estate.[6]  An

5  iterative process of four plan amendments placated various

6  partially-secured creditors and yielded a consensual plan

7  reducing unsecured debt by more than $885,000.  Unsecured claims

8  (mostly unsecured portions of secured claims) estimated at

9  $1,062,350 would be paid $176,710 (16.6%) over 60 months.[7]

10     Dumitru's $150,000 claim became the final obstacle to plan

11 confirmation.

12     The proposed plan treated Dumitru's claim as unsecured to be

13 paid by sharing in the 60 monthly distributions to unsecured

14 creditors, with the unpaid balance to remain as excepted from

15 discharge by virtue of § 523(a)(15) and the Article IX that had

16 been in the plan since first proposed in December 2011.[8]

17     But, Dumitru forced a different course.  He objected to plan

18 confirmation and hired a veteran Chapter 11 lawyer, who appeared

19 at a hearing on June 11, 2012, persuading the court to decline to

20

21

22     [6]Dkt. 154.

23     [7]Dkt. ## 170, 204, 233, & 264.

24     [8]The discharge provision is:

25     9.01 Discharge. Confirmation of this plan does not discharge
       any debt provided for in this Plan until the court grants a
26     discharge on completion of all payments under this Plan, or
       as otherwise provided in Section 1141(d)(5).  The Debtor
27     will not be discharged from any debt excepted from discharge
       under Section 523 of the Code, except as provided in Rule
28     4007(c) of the Federal Rules of Bankruptcy Procedure.

confirm the plan over Dumitru's pending objection.[9]

Negotiations ensued. Communications among counsel noted the various issues, including Corina's offsets and potential property liability litigation, and focused on a "global" settlement. The outcome was a final plan amendment filed July 12, 2012.

The negotiated amendment created a separate Class 11 for Dumitru, who would receive a prompt $45,000 one-time payment to satisfy his claim "in full" in exchange for which he "waived" further claims "of any kind."[10]

Dumitru's separate Class 11, designated as impaired, described the class and treatment:

> The special unsecured claim of Dumitru Dragnea created by a marital settlement agreement or judgment of divorce and not in the nature of support. Estimated claim: $100,000. *The treatment set for[th] in this class also settles any current of [or?] potential litigation concerning the ownership of 1465 Thunderbird Drive, South Lake Tahoe, CA 96150.

> Claim shall receive a one-time lump sum payment of $45,000 within 60 days of the effective date of the plan. This claim satisfies Claimant's claim in full. Any further claims by claimant, of any kind, are waived. Payment is made possible by the funds accumulated in Debtor's DIP account.

> Finally, Debtor agrees to surrender her interest in 1465 Thunderbird Drive, South Lake Tahoe, CA 96150 as provided in class 8 of the plan. As such claimant, Dumitru Dragnea shall be the remaining owner of the property. The treatment set for in this class also settles any current or potential litigation concerning the ownership of 1465 Thunderbird Drive, South Lake Tahoe, CA 96150.[11]

---

[9]Dkt. ## 247, 256, & 259.

[10]Dkt. #264.

[11]Ex. A to Order Confirming Plan (7/26/2012); Dkt. #268. One dispute was Corina's liability for Lake Tahoe property allocated to Dumitru by the MSA. Plan Class 8 would surrender her interest and discharge the unsecured deficiency. The lump-sum payment in plan Class 11 also settled that dispute with Dumitru.

Dumitru signed and filed a ballot accepting the plan containing the global settlement, in which he stated:

> The undersigned, the holder of a Class [blank] claim against the Debtor in the unpaid amount of $45,000.$ [sum entered in Dumitru's handwriting] Accepts the plan.
> /s/ Dumitru Dragnea[12]

The next day, Dumitru filed a withdrawal of his objection to confirmation.[13]

The court confirmed the plan on July 23, 2012, in open court with oral findings of fact and conclusions of law and entered a confirmation order on July 26, 2012.[14]

Corina paid Dumitru the "one-time" $45,000 payment as required by the plan Class 11.

The Chapter 11 case was closed on March 21, 2013, subject to reopening for entry of discharge after completion of payments.

Four years later, in April 2016, Dumitru asked the state family law court to order Corina to pay him $105,000. He argued that the $45,000 lump sum under the plan was merely on account and ignored his own $70,214 unpaid MSA obligation to Corina.

Corina defended on the basis of the Chapter 11 plan, whereupon the California court held its proceeding in abeyance pending resolution of the issue by the bankruptcy court.

The Chapter 11 case was reopened October 20, 2017, for Corina's motion for discharge after plan payments were completed.

Dumitru conditionally opposed discharge, asking for a clarification that the MSA equalizing payment was not discharged

---

[12]Plaintiff's Ex. 23, Dkt. #265 (July 18, 2012).

[13]Dkt. #266 (July 19, 2012).

[14]Dkt. ##267 & 268.

because of § 523(a)(15). Declining to issue an advisory opinion without an adversary proceeding, the court entered discharge.

Dumitru filed this adversary proceeding for declarations under the Declaratory Judgment Act: (1) that the discharge in Corina's case does not excuse her from paying him $105,000 of the MSA equalizing payment; (2) that the $105,000 debt is excepted from discharge by virtue of § 523(a)(15); and (3) that Dumitru owns 50 percent of all their Romanian property.[15]

This decision contains findings of fact and conclusions of law rendered following the trial of that adversary proceeding.

## Jurisdiction

Jurisdiction is founded on 28 U.S.C. § 1334(b). Disputes regarding terms of Chapter 11 plans and the discharge status of particular debts are core proceedings arising "in" and "under" title 11 that a bankruptcy judge may hear and determine. 28 U.S.C. §§ 157(b)(2)(B), (I), (J), (L), and (O) & 1334(b).

A state-law contract included in a Chapter 11 plan that is integral to confirmation of that plan and permitted by 11 U.S.C. § 1123(b) arises "in" or is "related to" the title 11 case.

A state-law contract in a Chapter 11 plan is so related to the claims that are in the court's original jurisdiction under

---

[15]Paragraph 2 of Dumitru's demand is:

2. for a declaration by this Court that the discharge in the above-captioned Chapter 11 case has no effect on the Marriage Settlement Agreement entered into by the parties as herein alleged, and that Plaintiff is the owner of 50 percent of all of the Romanian property set forth in the Marriage Settlement Agreement.

Amended Complaint, Demand, ¶ 2.

§ 1334 that they form part of the same case or controversy under Article III of the United States Constitution for which there is supplemental jurisdiction pursuant to 28 U.S.C. § 1367. <u>Sassoon v. Sokoloff (In re Sassoon)</u>, 424 F.3d 864, 869 (9th Cir. 2005); <u>Bahrampour v. Lampert</u>, 356 F.3d 969, 978 (9th Cir. 2004).

The Declaratory Judgment Act applies in title 11 cases, perhaps except as to tax disputes under 11 U.S.C. §§ 505 and 1146. 28 U.S.C. § 2201(a).

In case of doubt about this court's authority, the parties have consented to entry of judgment by a bankruptcy judge.

Nor does the so-called "family law" exception to federal jurisdiction militate against entertaining a dispute regarding a MSA. The Supreme Court in <u>Ankenbrandt v. Richards</u>, 504 U.S. 689, 703-04 (1992), cabined that exception to granting a divorce, alimony, and child custody, but not to such ancillary questions as property distribution.

While federal bankruptcy courts are naturally reluctant to become embroiled in domestic disputes and have broad authority under 28 U.S.C. § 1334(c)(1) to abstain in favor of state courts, some such matters need to be confronted. This is one of them.

<u>Conclusions of Law</u>

Plaintiff's theory misses the mark. The fact that § 523(a)(15) excepts from bankruptcy discharge a divorce-related MSA debt does not prevent use of a Chapter 11 plan to accomplish a bilateral amendment of a MSA by way of accord and satisfaction that leads to a contractual discharge of the debt under nonbankruptcy law. Nor can plaintiff plausibly collaterally

attack the Romanian property division in this court.  The
relevant law relates to contract law and the law relating to
finality of judgments, not bankruptcy law.

I

Basic contract doctrines control the analysis relating to
the MSA.

A

The MSA is a contract controlled by California law: made in
California by California residents to be performed in California.

1

A MSA that is incorporated into a dissolution judgment is
construed under the rules governing interpretation of contracts
generally.  <u>State Farm Life Ins. Co. v. Brockett</u>, 737 F. Supp. 2d
1146, 1152 (E.D. Cal. 2010); <u>In re Marriage of Iberti</u>, 55 Cal.
App. 4th 1434, 64 Cal. Rptr. 2d 766, 769 (Cal. Ct. App. 2 1997).

California contract rules are prescribed by statute in its
Civil Code.  Topics relevant to this case include interpretation
of contracts governed by Civil Code §§ 1635-1663, modification of
contracts per Civil Code § 1698; accord and satisfaction per
Civil Code §§ 1521-1526; and novation per Civil Code §§ 1530-32.
CAL. CIV. CODE § 1521-26, 1530-32, 1635-63 and 1698.

a

Like any other contract, a MSA may be amended by agreement
in a contract in writing.  CAL. CIV. CODE § 1698(a).

b

California contracts are interpreted according to the mutual intent of the parties at the time of contracting.  CAL. CIV. CODE § 1636.

The language of a written contract is the sole source for discerning the intention of the parties, if possible.  CAL. CIV. CODE § 1639.

The whole of a contract is taken together, giving effect to each part, if reasonably practicable.  CAL. CIV. CODE § 1641.

Words are construed in their ordinary and popular sense, rather than their strict legal meaning.  CAL. CIV. CODE § 1644.

Ambiguous or uncertain terms must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.  CAL. CIV. CODE § 1649.

Clauses written by special direction of the parties prevail over language originally prepared without special reference to the particular parties.  CAL. CIV. CODE § 1651.

If one is nevertheless uncertain after application of the preceding rules, then the language is construed against the party who caused the uncertainty to exist.  CAL. CIV. CODE § 1654.

c

The "Accord and Satisfaction" Chapter is in the Civil Code's "Extinction of Obligations" title.  CAL. CIV. CODE §§ 1521-26.

An "accord" is an agreement to accept, in extinction of an obligation, something different from or less than that which the person agreeing to accept is entitled.  CAL. CIV. CODE § 1521.

Acceptance of consideration for an accord is "satisfaction"

that "extinguishes" the obligation.  Cal. Civ. Code § 1523.

Part performance of a duty, when expressly accepted by the creditor in writing in satisfaction or in pursuance of an agreement in writing for that purpose, without any new consideration, "extinguishes" the duty.  Cal. Civ. Code § 1524.

Thus, an agreement providing that the obligee will accept a stated performance in satisfaction of an obligor's existing duty, even without consideration, is an "accord and satisfaction."  3 Ann Taylor Schwing, Cal. Affirmative Defenses § 63:6 (2d ed. 2019) ("Schwing"); 1 Bernard Witkin, Summary of California Law: Contracts § 981 (11th ed. 2019).

d

The "accord's" cousin, the "novation" (or "substituted contract"), is the substitution of a new contract for an existing one.  Cal. Civ. Code § 1530.

As between the same parties, "novation" is the substitution of a new obligation with the intent to extinguish the old obligation.  Cal. Civ. Code § 1531(1).

As a new contract, and unlike an "accord," a "novation" requires consideration because it is subject to all the rules concerning contracts in general.  Cal. Civ. Code § 1532.

e

Finally, an obligation is extinguished by a release in writing, with or without new consideration.  Cal. Civ. Code § 1541.

2

Although Corina alleges "novation" in the Amended Answer, it is not necessary to discern the element of consideration as it is beyond cavil that the plan Class 11 settlement constitutes an "accord and satisfaction" that, under California law, "extinguished" the debt without necessity for consideration.[16]

Corina promised in plan Class 11 to pay $45,000 as "full" payment of Dumitru's claim, in exchange for which Dumitru agreed that "Any further claims by claimant [Dumitru], of any kind, are waived." Dumitru thereupon withdrew his objection to plan confirmation and affirmatively accepted the plan. She subsequently paid the $45,000 when and as promised.

These facts square with Civil Code § 1524, which provides that part performance of an obligation, when expressly accepted by the creditor in writing in satisfaction, or rendered in pursuance of a written agreement, although unsupported by new consideration, "extinguishes" the obligation. CAL. CIV. CODE § 1524;[17] Schwartz v. Cal. Claim Serv., 52 Cal. App. 2d 47, 54-55, 125 P.2d 883, 887-88 (Cal. Dist. Ct. App. 2 1942).

---

[16]The issue was tried by implied consent. Fed. R. Civ. P. 15(b)(2), incorporated by Fed. R. Bankr. P. 7015. The Amended Answer asserting "novation" satisfies the pleading requirement for "accord and satisfaction." Fed. R. Civ. P. 8(c)(1), incorporated by Fed. R. Bankr. P. 7008.

[17]The text of Civil Code § 1524 is:

Part performance of an obligation, either before or after a breach thereof, when expressly accepted by the creditor in a writing, in satisfaction, or rendered in pursuance of an agreement in writing for that purpose, though without any new consideration, extinguishes the obligation.

CAL. CIV. CODE § 1524.

1   Similarly, Dumitru's promise that "Any further claims by

2   claimant, of any kind, are waived" functions as a release that

3   extinguishes the obligation under Civil Code § 1541.

4   Hence, California's accord and satisfaction law applies to

5   judgment debt, including MSA debt in a dissolution judgment.  The

6   parties remain able contractually to modify such debt in a manner

7   that amounts to accord and satisfaction and to execute releases.

8

9                                  B

10  This "accord" analysis is not peculiar to California.  The

11  Restatement(Second) of Contracts yields the same conclusion.

12  The Restatement speaks of "Discharge by Assent or

13  Alteration" in which two overlapping concepts — "accord" and

14  "substituted contract" — are pertinent.

15  An "accord" is a contract under which an obligee promises to

16  accept a stated performance in satisfaction of the obligor's

17  existing duty, the performance of which discharges the original

18  duty.  Until performance, the original duty is suspended.

19  Breach by the obligor entitles the obligee to enforce either

20  the original duty or any duty under the accord.  Breach by the

21  obligee entitles the obligor to specific performance requiring

22  acceptance of delivery of the stated performance and concomitant

23  discharge of the obligation, plus damages for partial breach.

24  RESTATEMENT(SECOND) OF CONTRACTS § 281 (1981) ("RESTATEMENT").[18]

25  _____

26  [18]The statement of § 281 (Accord and Satisfaction) is:

27      (1) An accord is a contract under which an obligee
        promises to accept a stated performance in satisfaction of

28      the obligor's existing duty.  Performance of the accord
        discharges the original duty.

15

A "substituted contract," or a "novation" in California law, is a contract accepted by an obligee in satisfaction of an obligor's existing duty.  It suspends and, upon performance, discharges an obligor's original duty.  Breach does not entitle an obligee to enforce the original duty.  RESTATEMENT § 279.[19]

The nature of the original duty helps distinguish accord from substituted contract under both the Restatement and California law.[20]  A court is less likely to find accord than substituted contract if the original duty was to pay money, undisputed, liquidated, and matured.[21]

---

    (2) Until performance of the accord, the original duty is suspended unless there is such a breach of the accord by the obligor that discharges the new duty of the obligee to accept the performance in satisfaction.  If there is such a breach, the obligee may enforce either the original duty or any duty under the accord.
    (3) Breach of the accord by the obligee does not discharge the original duty, but the obligor may maintain a suit for specific performance of the accord, in addition to any claim for damages for partial breach.

RESTATEMENT § 281 (1981).

[19]The statement of § 279 (Substituted Contract) is:

    (1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's original duty.
    (2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.

RESTATEMENT § 279.

[20]California's analog to substituted contract is "novation," which, unlike accord, requires consideration.  3 SCHWING § 64:6.

[21]Substantially identical comments are in § 279 and § 281:

    c. Accord distinguished.  Because the original duty is discharged regardless of whether the substituted contract is performed, a substituted contract differs from an accord,

16

Common law compositions are classic exercises of accord and satisfaction.  RESTATEMENT § 281, comment b, illus. 3 (1981).[22]

It follows that the MSA modification accomplished by way of Corina's Chapter 11 plan qualifies as an accord because it was treated as an undisputed obligation to pay a liquidated sum. Even if it is a substituted contract, Corina's actual performance of the payment obligation prescribed in her Chapter 11 plan would function to satisfy and discharge the original debt.

II

Confirmed Chapter 11 plans are construed as contracts in the same manner as consent decrees, which have elements of both judgment and contract.  <u>Hillis Motors, Inc. v. Hawaii Auto</u>

---

under which the original duty is discharged only if the accord is performed.  See § 281.  Whether a contract is a substituted contract or an accord  is a question of interpretation, subject to the general rules stated in Chapter 9.  In resolving doubts in this regard, a court is less likely to conclude that an obligee was willing to accept a mere promise in satisfaction of an original duty that was clear than in satisfaction of one that was doubtful.  It is therefore less likely to find a substituted contract and more likely to find an accord if the original duty was one to pay money, if it was undisputed, if it was liquidated and if it was matured.  Compare Illustration 1 to Illustration 1 to § 281.

RESTATEMENT § 279 comment c.; <u>id</u>. § 281 comment e (same).

[22]Common law composition is the subject of illustration 3 to Restatement(Second) § 281:
A, B and C, who are creditors of D, enter into a voluntary composition with D under which D promises to pay and A, B and C promise to accept 50% of their debts in full satisfaction.  The composition is an accord.  D's debts are suspended and are discharged if D pays the 50%.

RESTATEMENT § 281, comment b, illus. 3.

17

1  <u>Dealers' Ass'n</u>, 997 F.2d 581, 588 (9th Cir. 1993).

2

3                                  A

4       The debtor and creditors are Chapter 11 contract parties.

5  <u>Miller v. United States</u>, 363 F.3d 999, 1004 (9th Cir. 2004).

6       The federal rule of decision for construing contract terms

7  in Chapter 11 plans is to rely on state law where, as here,

8  there is no need for uniform national law on the question.

9  <u>Hillis Motors</u>, 997 F.3d at 588; <u>Utd. Comm. Ins. Serv. Inc. v.</u>

10 <u>Paymaster Corp.</u>, 962 F.2d 853, 856 (9th Cir. 1992).

11      The nature of confirmed Chapter 11 plans that have elements

12 both of judgment and of contract enables their use as a vehicle

13 contractually to modify otherwise nondischargeable debt.

14      Plan terms, for example, releasing third persons from their

15 guarantees may be enforceable under principles of contract law if

16 the affected guaranteed persons actually accept the plan.

17      Likewise, an accord and satisfaction of nondischargeable

18 debt, coupled with a contract never to sue to enforce the debt,

19 that are in an obligor's Chapter 11 plan that the obligee

20 actually accepts and which the obligor actually performs, is a

21 bilateral contract that discharges the obligation as a matter of

22 nonbankruptcy law independent of the bankruptcy discharge.

23      Nothing is remarkable about an agreement compromising

24 nondischargeable debt.  Nondischargeability litigation in

25 bankruptcy is routinely resolved by settlement that extinguishes

26 or discharges the obligation as a matter of nonbankruptcy law.

27      Such a settlement creating a nonbankruptcy discharge is a

28 matter of basic contract law under doctrines in the Restatement

(Second) of Contracts § 281 and as recognized in state law.

Nor is there anything untoward about including a settlement in a Chapter 11 plan.  The Bankruptcy Code provides that a plan may "settle or adjust" any claim or interest belonging to the debtor or to the estate and may "modify the rights of" holders of unsecured claims.  11 U.S.C. §§ 1123(b)(3)(A) & (5).

One may enforce a Chapter 11 plan provision providing for accord and satisfaction that is justifiable only as a matter of contract law in the same manner as enforcement outside bankruptcy — by way of an action for specific performance, plus damages. RESTATEMENT § 281(3).  No impairment of contract is involved. Neither the bankruptcy discharge injunction nor the injunctive authority of a bankruptcy court applies.  It is purely a matter of the contractual element of Chapter 11 plan confirmations.

B

Consensual releases in Chapter 11 must be distinguished from more controversial nonconsensual third-party Chapter 11 releases.

Nonconsensual releases of the liability of nondebtors by way of permanent injunction premised on 11 U.S.C. § 105 as an exercise of equitable power are forbidden by the law of this circuit.  Resorts Int'l v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394, 1401-02 (9th Cir. 1995); Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.), 885 F.2d 621, 624-27 (9th Cir. 1989); accord In re W. Real Estate Fund, Inc., 922 F.2d 592, 601 (10th Cir. 1990).

To be sure, the circuits are divided.  Some approve third-party releases in Chapter 11 plans.  E.g., SE Prop. Holdings, LLC

1  v. Seaside Engr'g & Surveying, Inc. (In re Seaside Engr'g &

2  Surveying, Inc.), 780 F.3d 1070, 1076-79 (11th Cir. 2015); SEC v.

3  In re Drexel Burnham Lambert Grp, Inc. (In re Drexel Burnham

4  Lambert Grp, Inc.), 960 F.2d 285, 293 (2d Cir. 1992); Menard-

5  Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694, 700-02

6  (4th Cir. 1989).  The Supreme Court has not spoken.

7      But these concerns do not apply here where there is neither

8  a § 105 injunction, nor a debt that would be discharged pursuant

9  to 11 U.S.C. §§ 524 and 1141.  No exercise of Bankruptcy Code

10  authority to impair contract, discharge debts, or issue is

11  implicated in this case.

12

13                            III

14      Back to California law and the Dragneas.

15

16                             A

17      The Dragnea MSA that is incorporated into the state court's

18  dissolution judgment provides a method for amending it by

19  agreement:

20      The provisions of this Agreement may only be waived,
        altered, amended, modified, revoked, or terminated, in whole
21      or in part, in a subsequent written agreement specifically
        referring to this Agreement and signed by both the parties.

22
    MSA § 12.4.
23

24      The MSA requires an amendment be: (1) a writing; (2)

25  specifically referring to the MSA; and (3) signed by each party.

26  No particular format is specified.

27      The treatment of Dumitru in Class 11 of Corina's Chapter 11

28  plan satisfies all of the MSA's criteria for amendment.  First,

    the plan itself is a writing.  Second, plan Class 11 specifically

                              20

refers to the MSA as the source of the provisions being modified.[23]  Third, both parties signed; Corina signed the plan, and Dumitru signed the ballot accepting the plan, as well as the withdrawal of his objection to confirmation.

Thus, Dumitru and Corina amended their MSA using the MSA's amendment rule in a writing specifically referring to the MSA signed by both parties executed in the course of resolving Dumitru's objection to plan confirmation.

The amended MSA provided for a one-time payment of $45,000 by Corina to resolve Dumitru's "claim in full."  And, Dumitru "waived" any further claim "of any kind."  These terms replaced the reciprocal payment requirements of $65,000 from Dumitru and $150,000 from Corina to Dumitru, and resolved a performance-related dispute regarding a South Lake Tahoe property.

Dumitru's waiver of "any further claims of any kind" operated as confirmation that he was accepting the payment in satisfaction of the MSA debt.

When Corina actually paid Dumitru the $45,000, the MSA payment obligations were fully performed.  No debt remained.


B

As a matter of applicable California law, the MSA debt to Dumitru was "extinguished" upon Corina's payment of the $45,000 "one-time" payment agreed to by way of the plan's Class 11:

> Part performance of an obligation, either before or after a breach thereof, when expressly accepted by the creditor in

---

[23]Class 11 is described as: "The special unsecured claim of Dimitru Dragnea created by a marital settlement agreement or judgment of divorce and not in the nature of support."

writing, in satisfaction, or rendered in pursuance of an agreement in writing for that purpose, though without any new consideration, <u>extinguishes</u> the obligation.

CAL. CIVIL CODE § 1524 (emphasis supplied).[24]

Civil Code § 1524 is a facet of California's rejection of the old rule holding invalid for lack of consideration an accord and satisfaction based on partial performance by an obligor of a judgment debt.  It validated common business practice.  <u>Schwartz v. Cal. Claims Serv.</u>, 52 Cal. App. 2d 47, 54, 125 P.2d 883, 888 (Cal. Ct. App. 2 1942) (judgment debt);[25] 3 SCHWING § 63:6.

---

[24]California Civil Code § 1524 is consistent with Restatement § 275, which explains that:

If a party before he has performed his duty under a contract, manifests to the other party his assent to discharge the other party's duty to render all or part of the agreed exchange, the duty is to that extent discharged without consideration.

RESTATEMENT § 275 (illustration 2).

[25]The <u>Schwartz</u> court's statement warrants repetition:

Section 1524 Civil Code does away with a rule which has long been regarded by the courts as supported by scarcely more than a superstition, and it gives recognition and validity to business practices that are of common occurrence. The satisfaction of judgments for less than their face value is of everyday occurrence, and since every such settlement represents an agreement mutually satisfactory to the parties and fraught with some benefit to each, it should not be the policy of the law to discourage such sensible arrangements under which a creditor can satisfy a judgment for what he thinks it is worth and a debtor can settle it for what he can afford to pay. A judgment debtor should not have to go into bankruptcy to rid himself of a judgment where he and his creditor are ready, able and willing to adjust and settle the debt.

<u>Schwartz</u>, 52 Cal. App. 2d at 55, 125 P.2d at 888.

C

The nature of accord and satisfaction as an affirmative defense means that Corina, as the proponent of the defense, has the burden of proof.  BII Finance Co. v. U-States Forwarding Servs. Corp., 95 Cal. App. 4th 111, 126, 115 Cal. Rptr. 2d 312, 323 (Cal. Ct. App. 2 2002); 3 SCHWING § 63:11.

Whether an agreement is an accord and satisfaction is a question of the intent of the parties and is a question of fact for the trier of fact.  Conderback, Inc. v. Standard Oil Co. Of Cal., 239 Cal. App. 2d 664, 680-81, 48 Cal. Rptr. 901, 912-13 (Cal. Ct. App. 1 1966).

The parties' intent is inferred, if possible, solely from the contract's written terms.  CAL. CIV. CODE § 1639; Santisas v. Goodin, 17 Cal.4th 599, 608; 951 P.2d 399, 405 (1998).

Words are interpreted in their ordinary and popular sense, rather than according to their strict legal meaning.  CAL. CIV. CODE § 1644; Santisas, 17 Cal.4th at 608; 951 P.2d at 405.

In other words, intent is based on the objective manifestation of the words in their ordinary sense as affected by surrounding conduct, rather than the subjective beliefs of the parties.  United Comm. Ins. Serv., Inc., 962 F.2d at 856.

A party's true intent is irrelevant if not expressed.  Id., 962 F.2d at 856.

The written terms of the treatment in Dumitru's special Class 11 in Corina's Chapter 11 plan are not ambiguous.  Corina's one-time payment of $45,000 satisfies in full Dumitru's claim based on the MSA.  Dumitru waives any further claims of any

kind.[26]  The provisions satisfy the MSA's requirements for an amendment and an accord and satisfaction.

This court finds as fact that the parties intended that the one-time $45,000 payment would be a complete resolution of Corina's MSA obligation in the nature of an accord and satisfaction.[27]  Nobody expressed a contrary intent.


IV

Dumitru levels three challenges in an effort to elude the logical consequences of the claim-waiver terms of plan Class 11.


A

First, Dumitru sees ambiguity in the plan's discharge provision at Article IX stating that no nondischargeable debt will be discharged.  He contends that this sufficiently clouds the terms of Class 11 so as to reduce the clarity of his waiver of all further claims of any kind and says that he always intended to be able to collect the full $150,000 equalizing payment.  In doing so, he urges that the plan be construed against Corina.  These points are not persuasive.


1

Dumitru's position offends several California rules of

---

[26]The class 11 treatment is: "Claim shall receive a one-time lump sum payment of $45,000 within 60 days of the effective date of the plan.  This claim satisfies Claimant's claim in full.  Any further claims by claimant, of any kind, are waived."

[27]This court need not, and does not, rule whether there is consideration for "novation" under California law or a "substituted contract" under the Restatement.  3 SCHWING § 64:6.

construction.  It requires that express provisions in the class

11 terms not be given effect contrary to Civil Code § 1641.

Dumitru's secret intent to renege on his waiver of further

claims of any kind is contrary to Corina's belief that Dumitru

understood, at the time the Class 11 terms were negotiated and

accepted by Dumitru, that he was waiving all further claims.

That would violate Civil Code § 1649.

Contrary to Civil Code § 1651, it would require preferring

terms of Article IX that were prepared without reference to the

particular parties and contract over the negotiated Class 11

terms prepared at the special direction of the parties.

As trier of fact, this court disbelieves Dumitru's testimony

about his intent.  Too many objective facts are to the contrary.

2

The drafting history of the plan belies Dumitru's position.

Article IX's generic statement about the effect of discharge was

in all previous plan versions in the preceding six months.

His position also implies that he was victimized by superior

lawyering on Corina's behalf.  The truth is to the contrary.

Dumitru forced the issue.  His counsel in the negotiating Class

11 was a wily veteran Chapter 11 lawyer, while Corina's counsel

at the time of proposing and negotiating the plan were

comparative novices.[28]  Dumitru's old pro was sly enough to let

plan Article IX linger as potential ambiguity; Corina's rookies

did not recognize the risk of ambiguity.

---

[28]Corina's counsel at the inception of the Chapter 11 case
ceased practice of law before the plan was proposed.

The discharge provision does not create a cognizable ambiguity between reasonable constructions. The unreasonableness of Dumitru's view is evidenced by his present claim of $105,000 without mention of the need to offset the $70,214 that he owed under the MSA. His hands in that respect are not clean.

In California, the intent manifested in the agreement and by surrounding conduct, rather than the subjective beliefs of the parties, are what matters. Utd. Comm. Ins. Serv., 962 F.2d at 856. Intent "is to be inferred, if possible, solely from the written provisions of the contract." CAL. CIV. CODE § 1639; Santisas, 17 Cal. 4th at 608, 951 P.2d at 405.

The reasonable construction is to prefer Class 11 over Article IX so as to give full effect to the Class 11 terms, which extinguished the debt as a matter of nonbankruptcy law, leaving nothing to be discharged by the bankruptcy discharge.[29]

B

Dumitru next complains about the omission in the disclosure statement of discussion of the value of Romanian assets, including the value of Metalotex Corporation. Since adequacy of disclosure is an essential element of plan confirmation, 11 U.S.C. § 1129(a)(2), this amounts to an attack on confirmation.

Principles of finality preclude at this late revisiting confirmation. Dumitru did not appeal the confirmation order. The deadline for seeking to revoke confirmation was 180 days

---

[29]Dumitru complains of self-inflicted harm. If he had not objected to confirmation and prompted the global settlement, then Article IX and § 523(a)(15) would have preserved his MSA claim.

1  after entry of the order on July 26, 2012.  11 U.S.C. § 1144.

2       Nor was Dumitru, as former manager of Metalotex, misled

3  about its value in a manner that could have affected his decision

4  to enter into the Class 11 global settlement.

5

6                                  C

7       Finally, Dumitru attempts to use this Declaratory Judgment

8  Action as a vehicle for collateral attack on the decisions of the

9  courts of Romania dividing Romanian community property.

10       His prayer for a declaration by this court he is "owner of

11  50 percent of all the Romanian property set forth in the [MSA],"

12  assumes that the California judgment that was recognized at his

13  request in Romania operated to compel Romanian courts to have all

14  Romanian community property shifted to a status of 50-50 co-

15  ownership.  That argument collapses of its own weight.

16       First, he is asking this court to review the validity of

17  decisions of courts of Romania regarding property in Romania.

18  Fundamental considerations of basic rules of sovereignty cast

19  doubt on such a power reposing in this court.

20       Even if this court could act as Dumitru requests, his sole

21  basis for his argument is the statement in the MSA that "Corina

22  and Dumitru agreed to equally divide the community property in

23  Romania."  That statement does not form a foundation sufficient

24  to support a property division different than the standard

25  marital property division in Romania.

26       The ordinary meaning of that language does not mandate 50-50

27  co-ownership contrary to ordinary rules of equal division of

28  marital property division in community property jurisdictions.

The usual method is to value and allocate property to the parties and to adjust unequal values by way of an equalizing payment.

The detailed analysis by the Romanian courts in the property division indicates that they did not regard the recognition of the California MSA as directing nonstandard analysis.  When the courts of Romania rendered their decisions dividing community property in Romania, they were "equally" dividing property under Romania's version of community property law.

Corina's actions in proceeding in Romania in the usual manner indicate she did not understand the MSA reference to equal division of community property in Romania to mean something different than conventional community property division.

Dumitru is arguing that the statement "Corina and Dumitru agreed to equally divide the community property in Romania" had a secret meaning that he did not disclose.  The ordinary meaning of the language is consistent with how Corina and Romanian courts understood it.  Dumitru's secret meaning is of no consequence.

Dumitru lost in the trial and appellate courts of Romania in his effort to retain 50 percent ownership of Romanian assets, especially Metalotex Corporation.

It is not appropriate for this court to entertain an appeal from the courts of Romania.


V

The Declaratory Judgment Act, which is invoked by the parties, is a more efficient procedural vehicle for addressing

this dispute than a contempt proceeding.[30]

A

The facts involve the rights and legal relations of the parties in connection with contractual aspects of the confirmed Chapter 11 plan that are within the jurisdiction of this court, but no discharged debt is implicated.

The confirmed plan "binds" the parties.  11 U.S.C. § 1141(a).  But the discharge injunction focuses on efforts to collect debts as a personal liability of the debtor with respect to discharged debt.  11 U.S.C. § 524(a).

Dumitru is "bound" by the confirmed plan, but is not pursuing a debt shielded from collection by the bankruptcy discharge.  Rather, he is trying to collect a debt that he caused to be extinguished under nonbankruptcy contract law by virtue of a plan provision that was negotiated at his insistence and that he affirmatively accepted.

Perhaps a refusal to honor the § 1141(a) "binding" effect of confirmation would qualify as a contempt and could be addressed by a contempt proceeding.  But, a bankruptcy court has the authority to entertain a declaratory judgment action to determine the scope of the bankruptcy discharge.  Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon), 153 F.3d 991, 994-95 (9th Cir. 1998).

Breach of a plan provision regarding rights and duties of parties that do not implicate a discharged debt is ill-suited to

_____

[30]Dumitru invokes 28 U.S.C. § 2201-02.  Amended Complaint, ¶ 9, Dkt 40.  Corina agrees. Amended Answer, ¶ 9, Dkt 43.

1   the contempt proceeding that is the usual response to a putative

2   discharge violation.  Contempt, by its very nature, is heavy-

3   handed and portends punishment over correction.

4

5                                   B

6        The utility of the Declaratory Judgment is that the court

7   merely declares the rights and other legal relations of

8   interested parties, which declaration has the force and effect of

9   a final judgment.  28 U.S.C. § 2201.

10       Further relief, which may include damages and attorney's

11  fees, may be awarded on motion made subsequent to the final

12  declaration, subject only to laches.  28 U.S.C. § 2202; <u>Horn &</u>

13  <u>Hardart Co. v. Nat'l RR Passenger Corp.</u>, 843 F.2d 546, 548-49

14  (D.C. Cir. 1988), <u>aff'g</u>, 659 F. Supp. 1258, 1262 (D.D.C. 1987).

15

16                                  1

17       The operative language of the Declaratory Judgment Act

18  provides:

19       § 2201. Creation of Remedy
              (a). In a case of actual controversy within its
20       jurisdiction, except with respect to ... a proceeding under
         section 505 or 1146 of title 11, ..., any court of the
21       United States, upon the filing of an appropriate pleading,
         may declare the rights and other legal relations of any
22       interested party seeking such declaration, whether or not
         further relief is or could be sought.
23
         § 2202. Further Relief
24            Further necessary or proper relief based on a declaratory
         judgment or decree may be granted, after reasonable notice
25       and hearing, against any adverse party whose rights have
         been determined by such judgment.
26
    28 U.S.C. §§ 2201(a) & 2202 (omitting exceptions not relevant).
27
         The corollary to the specification Declaratory Judgment Act
28
    of two title 11 provisions is that other Bankruptcy Code issues

                                  30

are within the ambit of the Declaratory Judgment Act.  <u>See</u> 12

JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 57.25[1][b] (2018).[31]

Federal Rule of Bankruptcy Procedure 7001(9) contemplates

declaratory judgments in bankruptcy litigation.  Fed. R. Bankr.

P. 7001(9); 10 COLLIER ON BANKRUPTCY ¶ 7001.10 (Richard Levin &

Henry J. Sommer, eds. 2019) ("COLLIER").


                                    a

The controversy must be within the jurisdiction of the

bankruptcy court.


                                    i

Here, the "binding" effect of terms of a confirmed Chapter

11 plan pursuant to § 1141(a) is within bankruptcy subject-matter

jurisdiction as "arising in," "arising under," or "related to"

the title 11 case.  28 U.S.C. § 1334(b).  It is a core

proceeding.  <u>E.g.,</u> 28 U.S.C. § 157(b)(2)(L) & (O).

The subject Chapter 11 plan would not have been confirmed

over Dumitru's objection without an expensive contested

confirmation hearing.  The negotiated resolution prompted him to

withdraw his objection to confirmation and to sign a ballot

accepting the plan, at which point confirmation of the

uncontested plan became a matter of routine.


_____

[31]The Moore's authors note that a 1988 amendment to § 2201
created linguistic confusion about the references to §§ 505 and
1146: whether they are excluded from general authorization of
declaratory relief, or excluded from the exception for tax cases.
The authors argue that §§ 505 and 1146 are excluded from the
exception for tax cases, not excluded from general declaratory
judgment authority.  12 MOORE'S FEDERAL PRACTICE §§ 57.25[1][a]-[b].

ii

The integral nature of the state-law accord in plan Class 11 to confirmation also warrants exercise of § 1367 supplemental jurisdiction.  28 U.S.C. § 1367; Sassoon, 424 F.3d at 869.  It is part of the same case or controversy.  Id. § 1367(a).  The state-law accord raises no novel or complex issue of state law.  Id. § 1367(c)(1). The state-law accord does not predominate over issues within original bankruptcy subject-matter jurisdiction including the § 1141(a) "binding" effect of the confirmed plan. Id. § 1367(c)(2).  The Chapter 11 case is not being dismissed. Id. § 1367(c)(3).  There are no other compelling reasons for declining jurisdiction.  28 U.S.C. § 1367(c)(4).

b

The reference in § 2201 to "any court of the United States" could be a procedural pothole.  Whether a bankruptcy judge may render a final decision or must make a report and recommendation to the district court may depend upon the position of the cognizant judicial circuit regarding whether a bankruptcy court is a "court of the United States" for purposes of the Judicial Code.  28 U.S.C. § 451.

Bankruptcy judges may render final decisions under the Declaratory Judgment Act in the Second, Third, Seventh, and Eighth Circuits because they construe the term "court of the United States" to include the bankruptcy court as a "unit" of the District Court.  See 10 COLLIER ¶ 7001.10.

The Third Circuit focused on that precise § 451 "court of the United States" question in concluding that a bankruptcy judge

1  has authority to hold an attorney liable for excessive costs

2  under 28 U.S.C. § 1927.  Appeal of Segal (In re Schaefer Salt

3  Recovery, Inc.), 542 F.3d 90, 105 (3d Cir. 2008).[32]

4      And, the Eighth Circuit has explicitly held that a

5  bankruptcy judge has the power to issue declaratory judgments

6  under § 2201 on a matter in actual controversy within bankruptcy

7  jurisdiction.  Sears, Roebuck & Co. v. O'Brien, 178 F.3d 962, 964

8  (8th Cir. 1999), cited with approval, 1 COLLIER ¶ 3.09[3].[33]

9      Although no circuit has held that bankruptcy judges may not

10  render final judgment under the Declaratory Judgment Act, the

11  Ninth, Tenth, and Eleventh Circuit have held that a bankruptcy

12  court is not a "court of the United States" for certain other

13  Title 28 purposes.  E.g., Perroton v. Gray (In re Perroton), 958

14  F.2d 889, 893-96 (9th Cir. 1992)(§ 1915).[34]

15      In circuits that do not regard bankruptcy judges as judges

16  of a "court of the United States" for purposes of § 2201, a

17  bankruptcy judge in a declaratory judgment action will make a

18

19  [32]Schaefer Salt squarely holds that a bankruptcy court is a
"court of the United States."  The Second, Seventh, and Eighth
20  Circuits appear to agree:  Adair v. Sherman, 230 F.3d 890, 895
n.8 (7th Cir. 2000); Baker v. Sparrowbush Assoc. (In re Cohoes
21  Indus. Terminal, Inc.), 931 F.2d 222, 230 (2d Cir. 1991);
Volpert v. Ellis (In re Volpert), 177 B.R. 81, 88-89 (Bankr. N.D.
22  Ill. 1995), aff'd, 186 B.R. 240 (N.D. Ill 1995), aff'd on other
grounds, 110 F.3d 494, (7th Cir. 1997); see also, Walton v.
23  LaBarge (In re Clark), 223 F.3d 859, 864 (8th Cir. 2000).

24      [33]And, Nat'l Union Fire Ins. Co. v. Titan Energy, Inc. (In
re Titan Energy, Inc.), 837 F.2d 325, 329-30 (8th Cir. 1988);
25  accord, Rex-Tech Int'l LLC v. Rollings (In re Rollings), 451 F.
26  Appx. 340, 345 (5th Cir. 2011)(non-precedential).

27      [34]And, Jones v. Bank of Santa Fe (In re Courtesy Inns,
Ltd.), 40 F.3d 1084, 1086 (10th Cir. 1994)(§ 1927); Gower v.
28  Farmers Home Admin. (In re Davis), 899 F.2d 1136, 1138-40 (11th
Cir. 1990)(§ 1927).

1  report and recommendation to the district court unless the

2  parties agree the bankruptcy judge may hear and determine it.

3  See, e.g., In re City of Central Falls, R.I., 468 B.R. 36, 48-49

4  (Bankr. D.R.I. 2012).[35]

5

6                                    c

7       The Ninth Circuit situation regarding the declaratory

8  judgment authority of a bankruptcy judge is unclear.  The fact

9  that the Ninth Circuit has, despite Perroton, affirmed

10 declaratory judgment decisions by bankruptcy judges without

11 questioning their authority to render § 2201 declaratory

12 judgments suggests that Perroton is limited to § 1915 in forma

13 pauperis rulings and has otherwise lost vitality.[36]  Simon, 153

14 F.3d at 994-95; Bear Valley Mutual Water Co. v. Prestige Point

15 (In re Prestige Point), 985 F.2d 573 (9th Cir. 1993)(mem.).

16      Any Ninth Circuit inconsistency, however, is irrelevant here

17 because the parties have agreed that this bankruptcy court may

18 hear and determine this declaratory judgment action.  Hence, this

19 court is authorized to render a final declaratory judgment under

20 § 2201, regardless of whether Perroton has vitality in the

21 context of declaratory judgments.

22

23

24

25     [35]Consent to a declaratory judgment may be attractive as
   more benign than the alternative of a formal contempt proceeding.

26
       [36]In bankruptcy cases, the § 1915 in forma pauperis issue
27 has been rendered of little significance by the enactment of 28
   U.S.C. § 1915(f) permitting waiver of certain filing fees for
28 low-income individuals, following a pilot program first enacted
   in 1993.  Pub. L. 103-121, § 111(d).

2

Further relief is another feature of the Declaratory Judgment Act.

A

The court may grant further necessary or proper relief against any adverse party whose rights have been determined by the declaratory judgment.  28 U.S.C. § 2202.

Declaratory judgments may be supplemented by further relief in the form of damages or equitable relief, so long as the movant is not barred by laches.  12 MOORE'S FEDERAL PRACTICE § 57.65; 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2771 (2016).

A prevailing party may obtain damages and attorneys' fees as § 2202 further relief.  Horn & Hardart Co., 843 F.2d at 548-49; id., 659 F. Supp. at 1262 ("both proper and efficient for [prevailing defendant] to prosecute its claims in a petition for further relief").

B

The standard remedy for breach of an accord and satisfaction is specific performance, plus damages.  RESTATEMENT § 281(3). Specific performance means requiring the breaching party to accept the accord by declining to render any relief to that party.  Damages typically include professional fees and related litigation expenses.

Corina's answer to the amended complaint requests attorney's fees, costs of suit, and other relief deemed just.  No record, as

of yet, has been made regarding these matters.

Whether Corina, as prevailing defendant, chooses to seek § 2202 further relief is up to her.

Conclusion

The plaintiff is correct that Bankruptcy Code October 24, 2019§ 523(a)(15) excepts his equalizing payment claim under the marital settlement agreement from discharge in bankruptcy.  All he had to do to preserve that status at the time of confirmation of his former spouse's Chapter 11 plan was nothing.  But, he chose to force the issue by objecting to confirmation, hiring seasoned Chapter 11 counsel, and insisting that his claim be dealt with in the plan.

The ensuing "global settlement" created plan Class 11 for him alone that provided for a lump-sum payment to resolve all issues between the parties (not merely the MSA) in exchange for his waiver of all future claims of any nature.  He withdrew his objection to confirmation and voted to accept the plan.

The form and substance of the agreement embedded in his Class 11 operated as an amendment of the MSA and an accord and satisfaction under applicable state law that, upon performance, extinguished the debt that would otherwise have been excepted from discharge.  The debt having been extinguished, nothing remained of it to be discharged in bankruptcy.

This court has no authority over the rulings of the courts of Romania regarding division of community property in Romania.

An appropriate judgment will be entered declaring the rights of the parties pursuant to the Declaratory Judgment Act.  The

36

1  debtor's bankruptcy discharge under § 1141, by virtue of

2  § 523(a)(15), does not operate to discharge debts established by

3  the marital settlement agreement incorporated in the parties'

4  divorce decree.  However, although the plaintiff at the outset of

5  the Chapter 11 case held a claim potentially excepted from

6  discharge under § 523(a)(15), he and the debtor agreed during the

7  course of the case to settle the debt in a form of agreement that

8  modified the MSA and qualified as an accord and satisfaction

9  under applicable nonbankruptcy law.  As a matter of state law,

10 the debt was extinguished during the case.  Having been

11 extinguished, no debt remains to be excepted from discharge.

12 This decision will be without prejudice to further relief under

13 28 U.S.C. § 2202.

14

15 Dated: October 29, 2019

16

17

18                    United States Bankruptcy Judge

19

20

21

22

23

24

25

26

27

28

# Instructions to Clerk of Court
## Service List – Not Part of Order/Judgment

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC.

Corina Dragnea
9411 Skydome Ct
Elk Grove CA 95624

David M. Sternberg
540 Lennon Ln
Walnut Creek CA 94598

Jacob Barlev
100 Smith Ranch Rd #306
San Rafael CA 94903

Stephen T. Cammack
915 University Ave
Sacramento CA 95825

Dumitru Dragnea
8801 Williamson Dr
Elk Grove CA 95624